James Edward JACKSON, A Minor Joined By His Mother, Lillie R. Thompson, Plaintiffs-Appellants,

v.

FRANKLIN COUNTY SCHOOL BOARD, Wanda Gandy, Robert Kimbrough, Larry Alford, et al., Defendants-Appellees.

No. 86–4279
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 24, 1986.

Willie L. Rose, Atty., Southwest Mississippi Legal Services, McComb, Miss., for plaintiffs-appellants.

W.H. McGehee, Meadville, Miss., for defendants-appellees.

Before REAVLEY, JOHNSON and DAVIS, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiffs, James Edward Jackson, a handicapped child, and his mother, Mrs. Lillie Thompson, brought this action under the Education of Handicapped Children Act (EHA), 20 U.S.C. §§ 1401–1454, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, claiming that James had been unlawfully excluded from defendant Franklin County Schools. We reverse and remand.

## I

**Facts & Background**

From 1979 through January 1984, plaintiff James Edward Jackson attended special education classes, pursuant to the Education of Handicapped Children Act (EHA), 20 U.S.C. §§ 1401–1454 (1978 & Supp.1986), in defendant Franklin County School System. In 1984, when this suit was filed, James was sixteen years old and handicapped with a learning disability; he was described at trial as functioning on approximately the third-grade level.

In late January 1984, James and two friends apparently accosted several female classmates. He was subsequently suspended for three days. Before the three-day suspension expired, delinquency charges were filed against James in the Youth Court of Franklin County, Mississippi. The Youth Court, with his mother's consent, sent James to East Mississippi State Hospital for evaluation and treatment.

On April 9, 1984, James returned home from the State hospital and made an effort to return to school. However, the record does not illuminate very clearly what transpired at this time. Dr. Aleta Schexnayder, the director of Franklin's special education programs, testified that in April she spoke with Donna Miller, James' social worker, informing her that this was not the best time for James to return to school. Dr. Schexnayder based this conclusion on several factors, including her belief that James' safety might be endangered, concern for other students' safety, and the fact that only a month of school remained, with exams beginning in about a week. Ms. Miller did not testify, but purportedly concurred with this opinion. Apparently, Dr. Schexnayder believed Ms. Miller was speaking with and acting on behalf of James and his mother. According to Mrs. Thompson's testimony, although she did not contact any school officials, she told Ms. Miller, "her representative," that she wanted James to go back to school. At no time did Dr. Schexnayder attempt to speak with or provide notice to Mrs. Thompson regarding the decision to withhold educational services from James.

On August 20, 1984, the first day of the fall term, Ms. Miller called Dr. Schexnayder inquiring about James' status. Dr. Schexnayder said James would need a new Individual Education Program (IEP) before enrolling, and also there was some problem because James was supposed to go before the Youth Court upon his return from the State hospital, but he had not yet done so. Dr. Schexnayder and James' principal seemed to believe that somehow the Youth Court matter precluded James' attendance at school, but no one at the school made any effort to discuss this issue with the Youth Court judge or otherwise investigate the validity of this assumption.[1] Apparent-

---

1. In fact, at some point Ms. Miller informed Dr. Schexnayder that she had talked to the judge and he told her the Youth Court matter had nothing to do with James' readmission to school. Dr. Schexnayder recalled this conversation, testifying as follows:

> I remember at the time that I asked Mrs. Miller if she had statement, (sic) a written

statement to that effect for the School Board, other than a conversation that take (sic) place in a hall.

Ms. Miller did not have such a statement, and Dr. Schexnayder never considered calling the judge to ask him about it.

ly Ms. Miller and Dr. Schexnayder had several conversations at the beginning of September regarding James' status, and Dr. Schexnayder testified that she relayed Ms. Miller's concerns to the school board. Nonetheless, school officials continued to refuse to discuss development of an IEP, or regular class attendance, until the Youth Court matter was resolved.

Sometime around September 12, 1984, Mrs. Thompson filed a complaint with the State Department of Education. On September 19, Dr. Schexnayder responded to this complaint, citing the Youth Court matter as the reason for James' continued exclusion from school.[2] Mrs. Thompson subsequently spoke with Mr. Larry Jones, superintendent of the Franklin County School System, but to no avail. Finally, Mrs. Thompson sought legal assistance and on September 24, she filed suit claiming a deprivation of James' due process rights, and seeking a court order readmitting her son to school.[3]

On October 19, Franklin School officials notified Mrs. Thompson of an IEP conference to be held on October 23. School officials still had not received any information regarding settlement of the Youth Court matter, but nevertheless decided to develop an IEP for James. Mrs. Thompson did not attend the October 23 meeting. Subsequently, the IEP conference was rescheduled to October 31 to obtain her participation.

At the IEP conference Dr. Schexnayder explained that there were four priorities for James: (1) counseling and in-depth treatment; (2) vocational training; (3) academic preparation; and (4) strict supervision. After some discussion it became apparent that Franklin School officials believed a residential placement would be in James' best interest. Contrariwise, Mrs. Thompson rejected any placement options that would take James away from home, because, she said, she needed him for chores and protection around the house. Unable to resolve their differences, the conference ended with the school recommending residential placement. On December 13, 1984, a due process hearing was held to review this determination, and following a hearing the school board's decision was upheld. During the appeals process, Mrs. Thompson has rejected all alternative placements for James, insisting on her son's return to the special education classes he previously attended in Franklin County;[4] during these two years of legal bat-

2. Dr. Schexnayder provided the State Department of Education with the following explanation for her actions:
   James Jackson is under a temporary restraining order issued by juvenile court. He was to appear before the judge upon his release from East Mississippi and has not done so. The youth prosecuting attorney has petitioned the court to order James not to return to school. The school district is awaiting the outcome of these proceedings.

3. The original complaint relied exclusively on § 1983 for relief. It was later amended to state a cause of action under the EHA. In the original complaint, and to some extent before this court, the plaintiffs claim that the January suspension was racially motivated. We agree with the magistrate that "there is not one shred of evidence that James was placed on a three-day suspension for a racially motivated reason."

4. After the due process hearing, James appealed the impartial hearing officer's decision to a United States District Court, as provided by the EHA. 20 U.S.C. § 1415(e)(2). The present appeal follows a trial on the merits of this action.

While this case was pending in the district court, James filed a motion for preliminary injunction seeking to be returned to his then current placement, the Franklin County public schools. The district court denied this motion, *Jackson v. Franklin County School Board*, 606 F.Supp. 152 (S.D.Miss.1985), and on appeal we affirmed this judgment. We held that "the public schools unquestionably retain their authority to remove any student, handicapped or otherwise, who disrupts the educational process or poses a threat to a safe school environment." *Jackson v. Franklin County School Board*, 765 F.2d 535, 538 (5th Cir.1985).

In our previous opinion on this matter we expressly refused to consider James' contentions that he, acting through Ms. Miller, requested, but was denied, readmission to school following release from the hospital. 765 F.2d at 536 n. 1. The district court found that James did not seek readmission until the fall semester of 1984. In this opinion we consider whether this finding was clearly erroneous in light of the record and applicable law.

tles, James has received no public education.

On this appeal, James does not question the appropriateness of the educational placement recommended at the IEP conference. Instead, he argues that the magistrate erred in not finding that his due process rights were violated by being excluded from school in the spring of 1984, and the first two months of school the following fall. Believing that "the invaluable school time [James] lost ... cannot be replaced," the plaintiffs seek monetary damages.

## II

Although the right to an education arises not from the Constitution, but through legislation, it nevertheless is one of the most cherished and ardently protected of all rights. Indeed, "education is perhaps the most important function of state and local governments." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Formal education provides children with the skills, both social and intellectual, with which they may approach and conquer life's challenges. Disabled children confront these same challenges, but begin with the disadvantage of their individual handicaps. Recognizing the significant challenges these children

face, and the woefully inadequate preparation they traditionally received, Congress passed the Education of Handicapped Children Act of 1975.

As a state receiving funds under the EHA, Mississippi must assure that "all handicapped children [have] the right to a free appropriate public education." 20 U.S.C. § 1412(1). This mandate extends to all handicapped children within the state between the ages of five and eighteen.[5] In order to ensure that each child receives appropriate educational services, the statute elaborates a host of procedural safeguards, including a step by step process of appeals for parents dissatisfied with the educational services the state is providing.[6]

James originally sought relief claiming violations of his section 1983 rights, but later amended his pleadings to include a claim under the EHA. The trial court refused to consider James' section 1983 claim on the merits, believing that the EHA provided the exclusive remedy. In August 1986, several months after the trial court's decision, Congress amended the EHA, decreeing that parallel claims arising under the Constitution or other federal statutes could accompany an action under the EHA.[7] Applying retroactively to actions

---

**5.** In many cases this mandate broadens to include all handicapped children between the ages of three and twenty-one. The Act provides that, "with respect to handicapped children aged three to five and aged eighteen to twenty-one, inclusive, the requirements of this clause shall not be applied in any State if the application of such requirements would be inconsistent with State law or practice, or the order of any court, respecting public education within such age groups in the State." 20 U.S.C. § 1412(2)(B). Since James was sixteen when the actions that led to this case arose, he falls fully within the scope of the statute.

**6.** As discussed more fully below, the EHA's procedural safeguards require parents or guardians of handicapped children to be notified of any proposed change in "the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child," and must be permitted to bring a complaint about "any matter relating to" such evaluation and education. §§ 1415(b)(1)(C) and (E). Complaints brought by parents or guardians must be resolved at "an

impartial due process hearing," and appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level. §§ 1415(b)(2) and (c). Thereafter, "[a]ny party aggrieved by the findings and decision" of the state administrative hearing has "the right to bring a civil action with respect to the complaint ... in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." § 1415(e)(2).

**7.** The trial court's position apparently was based on *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3470, 82 L.Ed.2d 746 (1984), where the Court concluded, "that where the EHA is available to a handicapped child asserting a right to a free appropriate public education, based either on the EHA or on the Equal Protection Clause of the Fourteenth Amendment, the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim."

However, even had Congress not amended the EHA, we believe James' § 1983 claim was prop-

brought after July 3, 1984, Congress added the following subsection:

> Nothing in this title shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of handicapped children and youth, except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsections (b)(2) and (c) shall be exhausted to the same extent as would be required had the action been brought under this part.

Handicapped Children's Protection Act of 1986, Pub.L. No. 99–372, § 3, 100 Stat. 796, 797 (to be codified at 20 U.S.C. § 1415(f)).

■ When this suit was filed in September 1984, the procedures under subsections (b)(2) and (c) were not available to James. In response to her September 12 complaint to the State Department of Education, Mrs. Thompson was told the reason James could not return to school was the unresolved Youth Court matter. School officials did not notify Mrs. Thompson of, nor offer her the possibility of, an IEP conference at this time. Although we believe the EHA provides the clearest guidance as to the defendants' duty in this case, section 1983 was properly invoked by James in September 1984.

### III

As described above, there is significant confusion in the record regarding what transpired when James returned from the State Hospital in April 1984. Mrs. Thompson testified that she told Ms. Miller, James' social worker, that James should return to school. According to Dr. Schexnayder, when Ms. Miller first contacted her they had a discussion regarding the wisdom of James' return at that time. In particular, Dr. Schexnayder expressed concern for James' safety, the safety of other students, and the little time left in the semester. Dr. Schexnayder testified that she also told Ms. Miller that she thought James' IEP should be changed. In another conversation, Ms. Miller purportedly told Dr. Schexnayder that she agreed, presumably after having discussed the matter with Mrs. Thompson, that James should not return to school since only a few weeks remained in the term. Mrs. Thompson denied ever agreeing to this arrangement.

■ We need not determine whom to believe in this debate,[8] since we hold that the school's failure to convene a conference at this time was a *per se* violation of the EHA. Dr. Schexnayder testified that Mrs. Thompson was never directly contacted and was never notified, in April 1984, despite the fact that she believed a change in educational placement was warranted, and over a month of school still remained in the spring term. Yet the Act specifically requires that *"written prior notice* to the parents or guardian" be provided whenever a school "proposes to initiate or change ... the identification, evaluation, or education-

---

er. The Court's holding in *Smith* was limited to equal protection claims, whereas James sought relief for a deprivation of his due process rights. As the *Smith* Court recognized, the same analysis cannot be applied similarly to both. Addressing the possibility of recovering attorney's fees under a § 1983 due process claim, before the EHA was amended to provide such relief, the Court explained:

> [U]nlike an independent equal protection claim, maintenance of an independent due process challenge to state procedures would not be inconsistent with the EHA's comprehensive scheme.... [W]hile Congress apparently has determined that local and state agencies should not be burdened with attorney's fees to litigants who succeed, through resort to the procedures outlined in the EHA, in requiring those agencies to provide free schooling, there is no indication that agencies should be exempt from a fee award where plaintiffs have had to resort to judicial relief to force the agencies to provide them the process they were constitutionally due.

468 U.S. at 1014, 104 S.Ct. at 3471 n. 17.

8. The trial court accepted Dr. Schexnayder's account, finding that Ms. Miller "conveyed [the agreement] to Ms. Thompson, Jackson's mother, who agreed with the decision." It is unclear how the trial court could make such a finding since Ms. Miller never testified. However, we do not have to consider whether this finding was clearly erroneous, as we explain in the text.

al placement of the child or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(1)(C) (emphasis added). We agree with the Fourth Circuit in finding that failures to meet the Act's procedural requirements are "adequate grounds by themselves" for holding that the school failed to provide a free appropriate public education, as mandated by the Act. *Hall v. Vance County Board of Education*, 774 F.2d 629, 635 (4th Cir.1985) (citing *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

The magistrate came to the conclusion that "Ms. Thompson, not the defendants, is the cause of James' absence from ... the educational process." In fact, there is some indication in the record that written prior notice was sent to Mrs. Thompson in January.[9] But in April, after being informed by Ms. Miller that James was back and wished to return to school, Dr. Schexnayder made no attempt to contact Mrs. Thompson regarding James' educational placement. Surely parents should, and are expected to, vigilantly oversee their handicapped child's educational progress. However, under the Act the burden rests squarely on the school or agency to safeguard handicapped children's rights by informing their parents of those rights. As this court observed in a related context, "in most cases, the handicapped students and their parents lack the wherewithal either to know or to assert their rights under the EHA and section 504." *S–1 v. Turlington*, 635 F.2d 342, 349 (5th Cir.1981). If Mrs. Thompson received no notification, she could hardly be faulted for not protecting rights she did not know existed.[10]

**9.** The magistrate made no specific finding on the question whether the school provided "written prior notice" as required by the Act. As recounted in the text, Dr. Schexnayder testified that she never contacted Mrs. Thompson in April 1984, when James returned from the State Hospital. However, there is some indication in the record that notice of a need for an IEP conference was sent in January, at the time Mrs. Thompson received notification of the three-day suspension. But this testimony is partially contradicted elsewhere in the record, and the January letter informing Mrs. Thompson of an IEP conference was never proffered as evidence; also, other documents cast significant doubt over its actual existence.

In questioning by plaintiff's counsel, Dr. Schexnayder testified as follows:

Q. You didn't really send her any notice [in April] that you were considering placing James in a different educational program, did you, placement program, did you?

A. I did not send any notice at that time.

Q. As a matter of fact, you really did not send Mrs. Thompson any kind of notice whatsoever relating to this matter except for you may have sent notice on the three day suspension?

A. In January she received the notice of the three day suspension.

At this point, then, the witness did not mention written prior notice sent in January. Later, on direct examination by defendants' counsel, she testified as follows:

Q. Did y'all cause a notice to be sent to the Plaintiff's mother, Mrs. Lillie Thompson?

A. Yes. The notice would have been mailed to the mother stipulating the reason for the suspension, the length of the suspension and giving her the right to come in for a conference and informing her that an IEP would have to be reviewed or revised before he returned to school.

Yet no copy of such a letter was introduced into evidence. More importantly, Defendants' Exhibit 9, a document entitled "Franklin County Schools Documentation of Parent Contacts," does not mention any such notice. This document, however, lists over six other occasions when "written prior notice" was sent to Mrs. Thompson regarding IEP revision.

Without the guidance of the district court we certainly are not prepared to draw any conclusions regarding this factual question. Because we hold that failure to provide a hearing in April, and then again in August, violated the procedural safeguards of the Act, the issue of a notice to Mrs. Thompson in January has no effect on our decision.

**10.** In *Rowley*, the Court stated that "Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies." 458 U.S. at 208, 102 S.Ct. at 3052. The Court quoted from the Senate Report, as follows:

The Committee recognizes that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome. By changing the language [of the provision relating to individualized educational programs] to emphasize the process of parent and child involvement and to provide a written record of reasonable expectations, the Committee intends to clarify that such individualized planning conferences

Even if James' mother "voluntarily agreed," through Ms. Miller, to his withdrawal from school in the spring of 1984, a conference should nevertheless have been convened. The formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decision-making. Moreover, it must be remembered that the right to an education is not simply the parent's right to give up.[11] Although under most circumstances parents should be granted wide latitude in determining their child's *appropriate* educational placement, *see, e.g., Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), this deference does not extend to changes in placement that amount to no placement at all. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 245, 92 S.Ct. 1526, 1548, 32 L.Ed.2d 15 (1972) (Douglas, J., dissenting) ("It is the future of the student, not the future of the parent, that is imperiled...."). The framers of the EHA intended that handicapped children should participate, whenever appropriate,[12] in the development of their educational programs to help ensure that their rights are properly protected. A formal convening of an IEP conference, with Mrs. Thompson in attendance, and James' participation encouraged, would have provided a forum for a thorough examination of the appropriate course to follow. In contrast, the informal procedures adhered to in the spring of 1984, demonstrate exactly those problems that the framers of the EHA tried to avoid with the procedural steps required by section 1415.

Whatever dispute exists surrounding the events of the spring of 1984, there is no question that Mrs. Thompson, both individually and through James' social worker, Ms. Miller, actively sought readmission of James the following fall. In the brief to this court, defendants' counsel suggests that Mrs. Thompson took no action until she filed the complaint on September 12 with the State Department of Education. Counsel conveniently overlooks the many conversations between Dr. Schexnayder and Ms. Miller beginning the first day of school in August, even though the defendants relied on similar conversations when defending the "decision" not to provide services the previous semester.[13]

---

are a way to provide parent involvement and protection to assure that appropriate services are provided to a handicapped child.
*Id.* (quoting S.Rep. No. 94–168, 94th Cong., 1st Sess. 11–12 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1435–36).

**11.** James' right to an education stems from several different sources. Foremost, the EHA guarantees an appropriate education to all children between the ages of five and eighteen. 20 U.S.C. § 1412(2)(B), *see supra* note 5. In addition, the Mississippi Constitution states that "[t]he Legislature may, in its discretion, provide for the maintenance and establishment of free public schools for all children between the ages of six (6) and twenty-one (21) years." Miss. Const. art. VIII, § 201. Effectuating this mandate, the Mississippi Legislature enacted a law for the maintenance of "a uniform system of free public schools consisting of grades one through twelve." Miss.Code Ann. § 37–13–1 (1972).

**12.** Section 1401(19), which sets forth the manner in which a proper IEP is developed, states as follows:
  The term [IEP] means a written statement for each handicapped child *developed in any meeting* by a representative of the local educational agency, ... the teacher, the parents or guardian of such child, *and, whenever appropriate, such child....*
20 U.S.C. § 1401(19) (emphasis added).
  The importance of the IEP conference cannot be denied. During the congressional debates Senator Williams explained as follows:
  I think that one of the greatest benefits that can come to the handicapped child is to have the parents brought into this conference, because the education of the child continues after the school doors close and that child is at home. This is part of the educational process. That is one of the reasons why we have developed the idea of the mandatory conference, to make sure that the parent is part of the education of the child.
121 Cong.Rec. 19501 (1975).

**13.** When defending their actions in the spring of 1984, defendants rely on Ms. Miller's acquiescence to the decision not to provide services. When discussing the fall semester, however, the defendants expediently forget Ms. Miller's role in attempting to have James readmitted in August. The defendants cannot have it both ways, despite their protestations to the contrary. Moreover, even if we adopt September 12 as the date Mrs. Thompson first attempted to reenroll James, or even September 24, the date she filed suit in federal court, the defendants still waited a month to provide notice of an IEP conference.

Apparently, the magistrate viewed the continuing jurisdiction of the Youth Court as sufficient reason for denying James readmission in the fall. But clearly there was no reason for him to so believe, especially since the IEP conference ultimately was convened without any resolution of the Youth Court matter. Not until October 19, nearly a month after this suit was filed, did the defendants provide notice of an IEP conference. Thus, for two months in the fall the defendants unilaterally deprived James of his right to an education without ever giving written notice of cause, or providing a hearing.

In a case arising outside the special context of handicapped children, the Court in *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), held that even a short suspension of up to ten days requires notice of the charges, and some type of informal hearing. Suspensions exceeding ten days require more formal procedures. *Id.* at 585, 95 S.Ct. at 741. "The fundamental requisite of due process of law is the opportunity to be heard," *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), a right that "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to ... contest." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). We conclude, therefore, that under either the EHA or the Fourteenth Amendment, school officials were required to provide James with notice and a hearing regarding his continued exclusion from school. Indeed, the fact that James was a handicapped student only worsens the consequences of the due process violation that occurred in this case.

### IV

■ We hold, as a matter of law, that James' due process rights, as contemplated by the Fourteenth Amendment and as specifically enumerated by the EHA, were violated by Franklin County School officials' failure to provide notice and a hearing concerning his continued exclusion from school. It does not follow that plaintiffs are entitled to substantial damages, however. Mrs. Thompson seemed especially obstinate and self-serving regarding what might be done to educate James, and thus is substantially at fault for James' loss after October 1984. We cannot discern from the record whether Mrs. Thompson would have been equally obstinate if provided the same options in April. Nor do we know whether school officials would have offered a plan of placement more acceptable to Mrs. Thompson if a conference had been held in April. It appears from the record that both parties' positions stiffened by the time they met in October.

■ We therefore remand this case so the district court can seek the answer to two questions. First, what is the extent of James' loss *caused by the defendants' failure* to provide notice and a hearing in April, and again in August, 1984. The district court should determine whether Mrs. Thompson, if provided notice and a hearing in April and/or August, nevertheless would have rejected the educational placements offered. Even though the school's proposals in October were adequate, the court may consider whether other options might have been offered in April, prior to the stiffening of positions due to the increased adversarial nature of the relationship between the parties. In short, while perhaps impossible to do with any precision, we ask the district court to bring the parties back to April 1984, to discover what would have happened if the school had held the conference.

Secondly, the district court must determine what damages, either monetary, or in the form of remedial educational services for James, would be appropriate at this time. If it becomes apparent that Mrs. Thompson would have followed the same obstinate course in April that she took in October, only nominal damages would be appropriate. However, if the district court finds that circumstances would have been different, and James was injured by the defendants' actions or omissions, damages should be assessed. We add, finally, that

if such is the case, although monetary relief is available, remedial educational services may be more valuable than any pecuniary damages that could be awarded.

REVERSED AND REMANDED.