VALERIE J. and Michael J. Individually and as Parents and Next Friends of Casey J.

v.

DERRY COOPERATIVE SCHOOL DISTRICT, et al.

No. C–88–412–L.

United States District Court, D. New Hampshire.

Aug. 1, 1991.

Wadleigh, Starr, Peters, Dunn & Chiesa by Robert E. Murphy, Jr., Manchester,

N.H., Castaldo, Hanna & Malmberg by Arpiar C. Saunders, Jr., Disabilities Rights Center by Ronald K. Lospennato, Concord, N.H., for plaintiffs.

Devine, Millimet, Stahl & Branch by Matthias J. Reynolds, Manchester, N.H., N.H. Atty. General's Office by Claire L. Gregory, Concord, N.H., Soule, Leslie, Zelin, Sayward & Loughman by Gordon B. Graham, Salem, N.H., for defendants.

## FINDINGS OF FACT AND RULINGS OF LAW

LOUGHLIN, Senior District Judge.

This involved, lengthy and complex case was tried before the court and jury. The court acted in a capacity as a fact finder with respect to the Education of the Handicapped Act, 20 U.S.C. § 1415 and the jury as fact finders rendering an advisory opinion concerning 42 U.S.C. § 1983.

This is also an appeal from a decision issued by Hearing Officer, Eric Falkenham of the New Hampshire Department of Education after an administrative hearing held pursuant to IDEA on April 26, 28, 1988. Before the court is plaintiffs' claim seeking compensatory education from April 1987 through November of 1988.

The plaintiffs in this case are Casey J., a twelve year old educationally handicapped student and his parents Valerie J. and Michael J. who reside within the Derry School District. Controversy arose when the parents of Casey J. believed that Casey J. was not receiving a free and appropriate public education. Suit was instituted against the Derry Cooperative School District, five members of the Derry School Board, the Superintendent of Schools and the State of New Hampshire.

Succinctly, the plaintiffs complain that the Derry Cooperative School defendants violated their rights by doing the following: suspending Casey J. from school for a twenty day period and ordering easement days. (Easement days, a sobriquet for having a parent of a student who is acting up or disrupting a class come to school and take the student home) and preconditioning Casey J.'s education on his taking medi-cation i.e., Ritalin. In its action against the State of New Hampshire the plaintiffs contend that the defendant state was aware of what the school district was doing and failed to correct the problem through appropriate complaint procedures. The court at the conclusion of the plaintiffs' case dismissed the action against the State of New Hampshire. The jury could not arrive at a decision and a mistrial was declared by the court after a twelve day trial and a day and a half of deliberation. The seven person jury could not agree, four of the jurors favoring a verdict for Casey J., three in the negative. Special questions were never answered as the jury could not resolve the first issue of liability.

The court makes the following findings of fact and rulings of law.

This case is different from most cases under the Act in that the parents of Casey J. went public and this case garnered national attention as articles were published in People Magazine and the J.'s appeared on Nightline and the Geraldo Rivera television show.

Valerie J. and Michael J. were married on May 26, 1972. Two children were born of this union, Marissa on April 1, 1977 and Casey on November 3, 1978.

Casey J.'s parents became aware of possible difficulties with him during the summer of 1985. Casey J. was referred to Dr. Robbins, a local pediatrician, in July, 1985. A highly controlled drug, Ritalin was given to Casey J. in varying doses. The kindergarten teacher had notified Casey J.'s parents that he was hyperactive prior to their seeing Dr. Robbins. A neurological examination of Casey J. was normal.

In September, 1985 Casey J. started the first grade in the regular or mainstream class. The school nurse and Valerie would administer Ritalin to Casey J. during school days. The first grade teacher, Wendy Fluet had rapport with Valerie J. and she noted that Casey J. had a lot of needs. At home Valerie J. noted behavioral problems such as lying, stealing and arguments with his sister. Casey J. did see a counselor and subsequently the parents saw Dr. Arse-

nault, a psychologist, for a short period of time.

Dr. Robbins saw Casey J. again on October 24, 1985. It was noted that Casey J. was less active while on Ritalin but seemed spacy or drugged and lethargic. The drug seemed to take the edge off, but Casey J.'s attention span was diminished.

Casey J. was seen by Dr. Robbins in January and April, 1986; Ritalin continued to be administered.

Casey J. started the second grade in September, 1986 in the mainstream class. Reading test scores in September, 1986 were not even on the charts they were so poor.

Another neurological examination of Casey J. on January 22, 1987 was normal, Ritalin appeared to be helping his concentration, but there were still behavioral problems. The last dose of Ritalin was administered by the school nurse on April 3, 1987. Casey J.'s parents had trouble with him at home as he destroyed furniture and other articles valued at $3,500.00.

On April 10, 1987 third-quarter report cards came out, grades began to worsen, behavior was a problem and Casey J. was subject to easement days.

Derry was aware of Casey J.'s learning disabilities as far back as September, 1987 and had no independent education plan in place for him.

Carey Grant is a psychologist for the Derry School District and has been so employed for fifteen years. Grant took a history from Casey J. who told Grant, "I am bad and need to be sent away." Grant administered tests to Casey J. on May 12, 1987 and the responses were unusual. Casey J. had average to high intelligence and good reasoning. Grant could not make a diagnosis, although he observed Casey J. rocking back and forth in class, fidgeting and appearing quite motor active. Grant recommended that Casey J. be fully evaluated at Children's Hospital in Boston, Massachusetts.

Casey J. went to Children's Hospital on September 4, 1987. On September 10, 1987, the Children's Hospital issued a report that stated Casey J. had characteristics of attention deficit disorder, but no neurological basis for his behavior. His IQ at eight years, six months was just above average. Dr. Alix Handlesman presently is a pediatrician practicing in Bedford, New Hampshire. In September, 1987 she was at Children's Hospital taking courses when she was assigned to Casey's case. She met Casey J. and his parents who were strongly opposed to the use of Ritalin or any kind of medication. The team at Childrens' impressions of Casey were that his reading was inconsistent, his problems commenced in nursery school which were behavioral in nature, hyperactivity and attention deficit disorder. Sixteen recommendations were made, some of which were cooperative learning, structured rather than competitive education and the trial use of the drug Cylert. Cylert can have side effects with the liver.

A proposed IEP was brought to the parents which included medication as recommended by two doctors. The court found the reference to two doctors ambiguous. Dr. Handlesman's IEP also included a small structured class room and a small number of students. Dr. Handlesman has never heard of a school district insisting upon medication as a prerequisite to an IEP. The recommendations in the report were the use of either Ritalin or Cylert, but only upon a pediatrician prescribing it and the parents agreeing to the use of such medication.

Dr. Handlesman had a follow-up meeting on November 14, 1987; the J.s never showed, though invited. Dr. Handlesman was quite impressed when school members appeared showing concern for Casey J. as this was unusual for school members to come to Boston. Casey J. was found to be impulsive and inattentive to detail.

In August, 1987 both parties asked the State of New Hampshire for a due process hearing.

Casey J. started the third grade in September, 1987. He started in a small class known as Project ME, an acronym for Management and Environment. His parents were informed by Derry representa-

tive, Hugh Holt that this project was limited to forty-five days. The J.s liked Project ME which was taught by Mr. Townsend, a special education teacher. Including Casey J., there were only seven students in the class. Project ME was extended over the original forty-five days. On December 3, 1987 Valerie J. unilaterally asked for and was granted a continuance of the due process hearing set for December 4, 1987. Derry was quite unhappy about her actions. On December 5, 1987 Superintendent Brown informed Hugh Holt that Casey J. was to be taken out of Project ME, home tutoring remained as an option to mainstreaming him. On January 16 or 22, 1988 Casey J. was taken out of Project ME and put back into the mainstream. Casey J. could not cope with mainstreaming, he rocked himself and gazed out the window and became generally inattentive and disruptive in class.

While Casey J. was in Project ME a meeting was held on October 19, 1987. Townsend thought Casey J. had emotional problems, the J.s thought he had learning disabilities and Derry thought he had other health impairments. The purpose of the meeting was to determine coding and placement for Casey J. prior to the expiration of the placement at Project ME, which was only temporary in nature. The IEP as drafted was not acceptable to Casey J.'s parents because it included the following. The taking of Ritalin, the use of removals from placement, which included "easement days" and suspensions to a maximum of twenty days.

Superintendent David Brown met with Casey J.'s parents on January 28, 1988 and told them that he had no choice, but to suspend Casey J. There was a hearing before the five member school board with many of Casey J.'s teachers present. Brown's recommendation which was suspension for the remainder of the year was not followed by the school board. The school board ordered Casey J. suspended until the date of the due process hearing before Eric Falkenham, the Hearing Officer. Casey J. was suspended for twenty days on April 12, 1988. Casey J. received home tutoring, but this was without prior notice to his parents and without an IEP. The due process hearing took place over two days, April 26, 28, 1988. Media was present during the hearings.

Falkenham's partial decision was issued on May 6, 1988 ordering Casey J. back to school. His full ruling was issued on May 25, 1988 and is the subject of this appeal. The Hearing Officer, Eric Falkenham ruled that the suspension violated the stay put provision of IDEA, which was not appealed by Derry. Falkenham also ruled that the requirement of voluntary easement days as a condition of Casey J.'s IEP was a violation of IDEA. Falkenham concluded that the IEP was appropriate overall which included the requirement that Casey J. be medicated.

In June, 1988 Casey J. began his one-on-one tutoring with Joan Paduchowski who was well qualified. She has a bachelor's degree from the University of New Hampshire and a masters degree from Rivier College. Prior to June, she had met Casey J. on May 6, 1988. Joan was sort of a guardian to Casey J. in the mainstream class. She observed him distracting the class and whenever he walked out of the room she would follow him to see that he did not harm himself. Finally on June 1, 1988 the one-on-one sessions began. Joan took a great deal of verbal and physical abuse from Casey J. There was an incident where Casey J. was injured when he fell and hit his head on a dumpster and received four stitches. The court finds that Joan was in no way to blame.

The first IEP was signed on June 1, 1988. Sometime prior to the due process hearing, counsel for the J.s had retained Dr. Cheryl Kelly as an expert for the hearing. Dr. Kelly received her doctorate from Vanderbilt University in psychology. Dr. Kelly conferred with Casey J.'s parents and met with Casey J. on August 4, 1988. Casey J.'s parents did not want to medicate Casey J. according to Dr. Kelly. She did a battery of tests on Casey J. which included intelligence and educational tests. Casey J.'s intelligence quota dropped seventeen points which was a radical departure from April, 1987. Her opinion was that this was

because of intellectual impoverishment due to the school. Casey J. had developmental writing and reading disorder, he was depressed and felt worthless. This was causally related to the post traumatic stress or anxiety disorder because of his experiences in the third and fourth grade. Casey J. will need counseling through high school, college and his first job.

In September, 1988 Casey J. continued the new school year on a one-on-one basis. Casey J. felt humiliated and isolated. On October 11, 1988 Casey J. was taken out of the Derry school. He received some private tutoring and was finally enrolled at the Spaulding School on November 9, 1988. Casey J. was at Spaulding until October 12, 1989 when he was enrolled at the Greenwood School in Putney, Vermont. While at Spaulding, Casey J. did very well and was considered a role model. Casey J. matriculated at Greenwood through the current school year ending in 1991. He is presently at a summer camp in Wolfeboro, New Hampshire the expense of which, $3,400.00 is being assumed by the defendant.

Dr. Fred Baughman a pediatrician and also a neurologist from San Diego, California became interested in this case because of media attention to it. He wrote to Michael J. and agreed to testify on the J.'s behalf.

He never examined Casey J., but the basis of his opinion was the reading of material associated with the case. It is his opinion that Casey J. has attention deficit and hyperactivity disorder which affects other classmates.

He testified to the following, that Ritalin is a central nervous system drug which has been in use since the 1940's. In the short run it calms individuals. When the behavior of the child is intolerable and everything possible has been done at home and at school, the family situation is on the ropes, then as a last resort use Ritalin. When Casey J. developed a lack of self worth, insomnia, touchiness and stomach aches Dr. Baughman felt that these side effects called for stopping Ritalin at a considerably earlier time.

Dr. Gerald Coles, an assistant professor in clinical psychiatry at the Robert Johnson Medical School in New Jersey, testified on behalf of the plaintiffs. He has a doctorate as a psychologist and specializes in learning and emotional disabilities.

He met the J.s over two years ago and reviewed Casey J.'s IEP. He opined that Derry never had an assessment of how Casey J. learned, neither did they realize that he had a strong interest in learning, had vitality, imagination and learning skill. He never examined Casey J.

Dr. Coles believed that Ritalin does not improve or enhance learning and can have a negative effect on learning by deteriorating the learning process. It is all right to use Ritalin on a short term basis.

Background

The Education of the Handicapped Act (EHA or Act), 20 U.S.C. § 1400 et seq. is a comprehensive scheme established by Congress to aid the states in meeting the educational needs of handicapped children by providing them with a "free appropriate public education." 20 U.S.C. § 1400(c); Sen.Rep. No. 168, 94th Cong; 1st Sess. 13, reprinted in 1975 U.S.Code Cong. & Admin.News 1425, 1437. (1975 Senate Report). The act was amended in October, 1990 and is now known as Individuals With Disabilities Education Act (IDEA).

Congress emphasized that IDEA is not simply a funding statute. The primary responsibility for providing the required education rests with the states.

The Act contains a strong focus on involving the handicapped child's parents, teacher and a representative of the local educational agency in the formulation of an "individualized education program" (IEP) tailored to the particular needs of the handicapped student. 20 U.S.C. §§ 1401(a)(18) and (19). Section 1415(b). Each child's IEP must be reviewed and, when necessary, revised, at least annually. 20 U.S.C. §§ 1414(a)(5), 1415(b)(1)(E). Parents of handicapped children must be notified in writing of any proposed change in their child's IEP, §§ 1415(b), 1415(b)(1)(C)(i), and be given an opportunity to bring complaints about "any matter relating to the

identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child" § 1415(b)(1)(E).

Complaints are reviewed at an "impartial due process hearing" conducted by the state or local education agency. § 1415(b)(2). A final decision must be reached no later than 45 days after the receipt of a hearing request. 34 C.F.R. section 300.512(a)(1) (1986). If a hearing is conducted at the local level, an appeal may be taken to a state agency which must render a final decision within 30 days. § 1415(c); 34 C.F.R. § 300.512(b)(1). An aggrieved party may appeal to federal or state court, which is empowered to grant appropriate relief. 20 U.S.C. § 1415(e)(2); 34 C.F.R. § 300.511. *Mrs. W. v. Tirozzi*, 832 F.2d 748 (2nd Cir.1987).

The State version of EHCA, RSA chapter 186–C (Supp.1981), declares: "[I]t is the purpose of this chapter to insure that the state board of education and the school districts of the state provide a free and appropriate public education for educationally handicapped children." RSA 186–C:1 (Supp.1981). In other words, RSA chapter 186–C (Supp.1981) represents New Hampshire's efforts to ensure compliance with the federal law. *Garrity v. Gallen*, 522 F.Supp. 171, 221 (D.N.H.1981). *Petition of Milan School District*, 123 N.H. 227, 231, 459 A.2d 270 (1983).

A succinct summary of the purpose of the Act is set forth in *Hendrick Hudson District Board of Education v. Rowley* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1981) in a opinion by Justice Rehnquist.

The Education of the Handicapped Act (Act), 84 Stat. 175, as amended, 20 U.S.C. § 1401 et seq. (1976 ed. and Supp. IV), provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures. The Act represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'"

With respect to the 42 U.S.C. § 1983 claim, the parties had the right to have a jury determine all factual issues presented to them. Unfortunately, as heretofore stated, the jury was hopelessly deadlocked on the § 1983 claims.

 Regarding the claim under the Act, this court serves in a different role. In essence, this court sits as an appellate court, although its duty is to evaluate all evidence independently and not to merely affirm or reverse the decision made by the state administrative hearing officer, Eric Falkenham. *Scituate School Committee v. Robert B.*, 620 F.Supp. 1224 (D.R.I.1985), aff'd without opinion 795 F.2d 77 (1st Cir. 1986). The court may, however, consider the opinions of the hearing officer, especially in making factual determinations requiring specialized knowledge. *Id.* The district court's role in an EHA case is to provide "something short of a trial *de novo*," *Colin K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983) and can best be characterized as conducting a review proceeding. We have previously held that for issues to be preserved for judicial review they must first be presented to the administrative hearing officer. *David D. v. Dartmouth School Committee*, 775 F.2d 411 (1st Cir. 1985).

One of the plaintiffs' claims is that The Derry School District repeatedly violated the procedural safeguard mandated by IDEA in the period between April, 1987 when Casey J. was determined to be educationally handicapped in November, 1988 when he was enrolled as a student at Spaulding Youth Center.

An important right guaranteed by the Act is the right to an Individualized Education Program (IEP). 20 U.S.C. § 1401(a)(19); 34 CFR § 300.342(a), New Hampshire Standards, Ed. 1109.01. Casey J. was educationally handicapped.

The parents and the school district were at loggerheads respecting the issue of med-

ication and easement days or administrative suspensions. There is no question when one reads the transcript of the hearing before Eric Falkenham and evidence adduced during the twelve days of trial that the authorities at the school district acted with the patience of Job. Casey J. was a disruptive influence not only to himself but to his teachers, classmates and his long suffering parents.

The IEP proposed for Casey J. and the recommendations by Children's Hospital were reasonable. With respect to medication the suggestion by Children's Hospital was that it was to be administered on the advice of a physician and with parental consent. Unfortunately the school district insisted that the parents consent to medication as a necessary component of the IEP. Further problems were encountered as far as the parents were concerned when the school district unilaterally suspended Casey J. from school for twenty days. In addition to this when Casey J. was unruly he was sent home from school using the euphemism of "easement days."

The Department of Education has issued a ruling for assuring compliance with IEP requirements of IDEA. 46 Fed.Reg. 5460 (1981) and codified as Appendix C to Chapter III of 34 C.F.R., which states:

> There may be instances where the parents and agency are in agreement about the basic IEP services (e.g. the child's placement and/or the special education services), but disagree about the provision of a particular related service (i.e. whether the service is needed and/or the amount to be provided). In such cases, it is recommended (1) that the IEP be implemented in all areas in which there is agreement, (2) that the document indicate the points of disagreement, and (3) that the procedures be initiated to resolve the disagreement.

34 C.F.R., App. C, pt. II (35a).

The court finds that the school district insisted upon Casey J. taking Ritalin, Cylert or some similar medication, that the parents also agree to administrative suspensions, and for a period between April, 1987 until November, 1987 were unreasonable in not implementing some sort of a compromise with respect to the IEP. Valerie J. did not act reasonably in unilaterally cancelling the administrative hearing on December 3, 1987 the day before the hearing.

The school district must establish an IEP for Casey J. at the beginning of each school year, review it annually, but more often if necessary. 20 U.S.C. § 1414(a)(5); 34 C.F.R. § 300.343(d). The child's parents, teacher, and a school district representative must be present at meetings where reviews and revisions take place. The onus is on the school district for initiating and conducting such meetings.

The school district did not convene any meetings when Casey J.'s behavioral problems continued to exacerbate and his school performance became worse. There appeared to be an implied agreement when Casey J. was initially placed in ME that this might be some sort of a temporary panacea. When he was transferred to a regular classroom or mainstreamed conditions became much worse. The regulations dictated that a meeting should have been convened to have an IEP review as this was an outrance.

In *Rowley*, the Court commented on the importance of the procedural safeguards in § 1415.

> When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g. §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard.

458 U.S. at 205–6, 102 S.Ct. at 3050–1.

The Court further noted that "adequate compliance with the procedures described would assure much of what Congress

wished in the way of substantive content in an IEP." *Id.* Lack of notice to the parents, then, regarding their procedural rights drives a stake in the very heart of the Act. *Town of Burlington v. Department of Education for the Commonwealth of Massachusetts,* 736 F.2d 773, 783 (1st Cir.1984).

In *Jackson v. Franklin County School Board,* 806 F.2d 623, 630 n. 12 (5th Cir. 1986) the Fifth Circuit stated: "The importance of the IEP conference cannot be denied." The court quoted from the legislative history as follows:

> I think that one of the greatest benefits that can come to the handicapped child is to have the parents brought into this conference, because the education of the child continues after the school doors close and that child is at home. This is part of the educational process. That is one of the reasons why we have developed the idea of the mandatory conference, to make sure that the parent is part of the education of the child.

*Id.* (121 Cong.Rec. 19501 (1975) (statement of Sen. Williams)).

The court now addresses the appeal of the plaintiffs of the decision of Eric Falkenham, the hearing officer for the New Hampshire Department of Education.

This court as the reviewing court should base its decision on the "preponderance of the evidence". In doing so it is by no means an invitation to the courts to substitute the court's own notions of sound educational policy for those of the school authorities which are reviewed. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050.

This court was faced with the problem so cogently set forth in the opinion of the First Circuit in *Town of Burlington v. Massachusetts Department of Education,* 736 F.2d 773 (1st Cir.1984).

With respect to the appeal, the Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial. The reasons for the supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an im-

proper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.... The determination of what is "additional evidence" must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo. Burlington,* 736 F.2d at 790–91.

■ The decision of the Hearing Officer to reinstate Casey J. on May 6, 1988 was a correct one. The court finds and so rules that the Derry School District did not follow procedures of the IDEA in the period between April, 1987 through November, 1988. Casey J. was educationally handicapped during this period and his parents were not granted procedural rights under the Act. Casey J.'s right to a free appropriate public education could not be premised on the condition that he be medicated without his parents' consent. The IEP was not appropriate as it related to the provisions for medication, suspension for twenty days and use of easement days. The court specifically finds that the ME program and the period when it was used was proper. Casey's parents agreed to it and while it was not all encompassing as it pertained to Casey's education under the circumstances then existing it was appropriate. Additionally, Casey's parents were not notified when decisions were made with respect to his education. The court refers to mainstreaming Casey from Project ME to a regular classroom.

The decision of the Hearing Officer inconsistent with the rulings of this court are overruled.

The plaintiff Casey J. seeks an award of compensatory education for at least one year after he graduates from high school or when he turns age twenty-one whichever comes later. Casey J. is now twelve years old, the defendants argue that such an order as the plaintiff Casey J. seeks is

premature and unwarranted under the circumstances of this case.

When an aggrieved party seeks relief in federal court under a section 1415(e) proceeding, the court clearly may award relief "[i]t determines is appropriate" under section 1415(e)(2). See *Lester H. v. Gilhool*, 916 F.2d 865 (3rd Cir.1990).

This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by the EHA. *Jefferson County Board of Education v. Breen*, 853 F.2d 853, 857 (11th Cir.1988). *Todd S. by Robert D. v. Andrews*, 933 F.2d 1576, 1584 (11th Cir.1991).

In *Lester H.*, the Third Circuit concluded that Congress empowered the courts to grant a compensatory remedy, 916 F.2d at 73. It ruled that the district court did not abuse its discretion by granting 30 months of compensatory education to the handicapped child beyond age 21.

In *Jefferson County*, the Eleventh Circuit affirmed the District Court's order that the Board fund an additional two years education beyond the handicapped child's twenty-first birthday, 853 F.2d at 858. In *Campbell v. Talladega County Board of Education*, 518 F.Supp. 47 (N.D.Ala.1981) the court recognized that an eighteen year old severely retarded boy was deprived in the past under the education act. The defendants were ordered to provide him with a free and appropriate public education for two years past his 21st birthday. *Id.* at 56.

In *Burr by Burr v. Ambach*, 863 F.2d 1071, 1078 (2nd Cir.1988) the court held that:

> It is true that a handicapped child does not have a right to demand public education beyond the age of twenty-one. Nevertheless, we believe that Clifford is entitled to a remedy for deprivation of the right that the statute clearly provided him—a free appropriate education between the ages of three and twenty-one, 20 U.S.C. § 1412(2)(B). Section 1415 of the EHA authorizes a district court to award "such relief as the court determines is appropriate."

The Office of Civil Rights has held in the following cases that students can obtain additional compensatory education beyond the age of twenty-one. *Augusta County (VA) School Division*, EHLR 352:233(CRR) (August 21, 1986); *Clermont (OH) Northeastern Schools*, EHLR 257:577(CRR) (July 23, 1984); *Kanawaha County School District*, EHLR 257:439(CRR) (September 28, 1983); *Chicago Board of Education*, EHLR 257:453(CRR) (March 11, 1983).

The court in response to defense counsel's request to depose Casey J. after the trial had commenced, did the following. After the court's preliminary questions on the qualifications of Casey J. as a witness, defense counsel was allowed to interrogate him. The court gave defendant's counsel the option to call Casey J. as a witness which offer was shrewdly declined. Casey J. was articulate, pleasant and an intelligent young witness for one so young. The court alludes to this because it has some reservations about awarding Casey J. compensatory education beyond the 1992–93 academic year. On the other side of the coin is the fact that the court's only contact with Casey J. was for a short period of time, approximately twenty minutes. The case law from other circuits seems overwhelming that compensatory education should be awarded past the age of twenty-one. As far as this court can determine, this issue has not been decided by the First Circuit.

■ Casey J. is awarded compensatory education for at least seven and a half months after he graduates high school or turns age 21 whichever comes later.

■ The plaintiffs under the authority of IDEA and 42 U.S.C. § 1983 seek monetary damages of $87,332.56. This relates to the denial of an appropriate education to Casey J. from May, 1987 when he was determined to be educationally handicapped through November of 1988 when he became a student at the Spaulding Youth Center.

The § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law. *Maine v. Thiboutot*,

448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1979). Municipalities are "persons" under § 1983, *Monell v. New York City Department of Social Services,* 436 U.S. 658, 700–701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978). *Owen v. City of Independence,* 445 U.S. 622, 649, 100 S.Ct. 1398, 1414, 63 L.Ed.2d 673 (1980) held that the common-law immunity for discretionary functions provided no basis for according municipalities a good faith immunity under § 1983 further noting that a court "looks only to whether the municipality has conformed to the requirements of the Federal Constitution and Statutes."

The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action. *Carey v. Piphus,* 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978).

From the period of May 1987 to November 1988 the court finds that the plaintiffs are entitled to compensation for seven and a half months. Casey J. was in Project ME from September, 1987 through January 16 or January 22, 1988. Project ME had been extended past its forty-five days by the acquiescence of all parties involved.

Counsel for the plaintiffs are also awarded reasonable attorneys fees which should be submitted to this court within thirty days of the issuance of this order.

### APPENDIX

### COURT'S RULINGS ON PLAINTIFFS' REQUESTS FOR FINDINGS OF FACT AND RULINGS OF LAW

The court makes the following rulings on plaintiffs' requests for findings of fact and rulings of law.

The following requests are granted with respect to findings of fact. Requests numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 granted in part, 11, 12, 13, 14, 15, 16 granted with the following correction. Casey was returned to the mainstream third classroom on either January 16, or January 22, 1988 as there was conflicting evidence on this issue. 17, 18, 19, 20, 21, 22 granted, 23 are granted in part and denied in part as Casey made some minimal educational progress in the tutoring and home tutoring placements made in the spring of 1988. 24 granted, 25 is granted subject to the court's rulings on Project ME, and 26.

The following requests are granted with respect to rulings of law. Requests numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 granted in part and denied in part, the court having specific reference to Project ME, 12, 13, 14, 15, 16, 17, 18, 19 are granted with the caveat that Opinion of the Justices cited dealt with mentally ill patients' right to refuse medical treatment; 20 is granted in part as a legal conclusion, but the case cited is not germane; 21, 22 granted with the following amendment, guardians and conservators of incapacitated individuals, 25 granted with the qualifications already stated with the case cited, 26, 27 granted with the same admonition concerning the case cited, 28 neither granted nor denied in its present form, 29, 30, 31, 32, 33, 34, 35, 36 granted although there is evidence of an oral communication, 37, 38, 39, 40, 41 are granted.