Gants, J.
The defendants — the City of Lowell (“the City”), George Tsapatsaris, both individually and in his official capacity as the Superintendent of City Schools (‘Tsapatsaris”), and William Samaras, both individually and in his official capacity as the Principal of Lowell High School (“Samaras”) — have moved for summary judgment under Mass.R.Civ.P. 56(c).
To prevail on summaiy judgment, the moving party must establish that there is no genuine issue of material fact on eveiy element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally, Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summaiy judgment if it “demonstrates, *344 by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
For the reasons stated below, the motion for summary judgment is granted on Count IV and, as to the defendant City of Lowell only, on Count III; and denied on Count I, Count II and, as to the individual defendants, on Count III.
BACKGROUND
In evaluating a summary judgment claim, I am obliged to rely only on facts not in dispute and disputed facts viewed in the light most favorable to the parties opposing summary judgment, which in this case are the plaintiffs — Heidi McLaughlin (“Heidi”)[3] and her parents, James McLaughlin and Patricia McLaughlin (collectively “the McLaughlins”). Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts recited below reflect the view of the case most favorable to the McLaughlins, and should not be understood as findings of the Court.
On or about January 16, 1992, Heidi McLaughlin, then a junior at Lowell High School, was raped by three other Lowell High School students. Criminal charges were brought against the three students, but all three were permitted to continue to attend Lowell High School while the charges were pending. As a result of the emotional distress caused by the rape and the continued attendance of the three rapists, Heidi did not believe she could continue to attend Lowell High School.
In late February or early March 1992, after Heidi had missed more than one month of school without tutoring or any other alternative educational program, her father telephoned the defendant Samaras, the principal of Lowell High School, and explained to him that Heidi could not attend Lowell High School because of the emotional trauma resulting from her rape. Mr. McLaughlin told Mr. Samaras that he had no idea what to do about his daughter’s education.
Nothing happened as a result of this telephone call; no action was taken, nor did anyone from the high ■ school or the special education department speak with the McLaughlins. As a result, Heidi continued to remain at home without tutoring or any educational program. On March 16; after roughly two weeks had passed with no action having been taken, Mr. McLaughlin telephoned Mr. Samaras again, and specifically requested that atutor be provided to his daughter. Mr. Samaras said he would “look into it.” Yet, despite this representation, nothing was done, so Mr. McLaughlin again telephoned Mr. Samaras in the latter part of March and repeated his request for a tutor. Mr. Samaras said he would look into the possibility of obtaining a tutor for Heidi.
By the beginning of May, nothing had yet improved for Heidi; she still remained at home, without a tutor or an alternative educational program. Early in May, the McLaughlins arranged a meeting with Mr. Tsapatsaris, which was attended by both Messrs. Tsapatsaris and Samaras. At this meeting, Mr. Tsapatsaris said that a classroom setting would be better for Heidi than a tutor, and asked if her attending Lowell Catholic High School would be acceptable. Mr. McLaughlin said they could not afford the tuition at a private high school. Mr. Tsapatsaris said that the tuition would be paid by the City since “your daughter will be a Lowell High student at Lowell Catholic for her protection.” Arrangements were promptly made for Heidi to attend Lowell Catholic, which she did.[4]
Heidi attended Lowell Catholic for her senior year, but she participated on the cheerleading team at Lowell High School. Ms. McLaughlin asked Mr. Tsapatsaris whether Heidi was covered for health insurance with her cheerleading, and he told her that there was no problem with insurance and no need for a waiver because Heidi was a Lowell High School student and was covered under the City’s policy.
In the spring of 1993, the McLaughlins learned for the first time that, as a result of the school she missed following her rape, Heidi would not have enough history credits to graduate either from Lowell High School or Lowell Catholic. The McLaughlins understood from Mr. Samaras that, if Heidi completed a history course at Middlesex Community College, she would be able to graduate with her class. Since the class would not be completed before graduation, they understood that she would be permitted to attend the graduation with her class and receive a blank diploma.
The McLaughlins had understood that Heidi remained a Lowell High School student while she attended Lowell Catholic but, in a meeting with Messrs. Tsapatsaris and Samaras, they learned that the school system did not share this view. Messrs. Tsapatsaris and Samaras told the McLaughlins that Heidi could not participate in the Lowell High School graduation because she was not a Lowell High School student. Mr. McLaughlin told the individual defendants that it would be emotionally devastating to Heidi if she could not participate in the graduation ceremony with her Lowell High classmates. Following this meeting, the McLaughlins took the necessary steps to re-register Heidi at Lowell High School, including preparing the required paperwork and obtaining her immunization records.
*345 While Mr. McLaughlin was attempting to re-register Heidi, he spoke with Patricia Kealy, the Housemaster at Lowell High School, who told him that Heidi could obtain the necessary history credits and graduate with her class if she received tutoring in history and passed the departmental exam. Ms. Kealy offered to provide the tutoring, since she has a master’s degree in history. Mr. McLaughlin thought this would be a splendid solution, and discussed this possibility with a member of the Lowell School Committee. That School Committee member spoke with Mr. Tsapatsaris about it, and Mr. Tsapatsaris rejected the proposal of a departmental exam.
The McLaughlins pressed this proposal, and eventually learned that it was to be considered in closed session by the Lowell School Committee. Finally, a few days before the graduation, either because the School Committee had ordered that Heidi be permitted to participate in her graduation or because Mr. Samaras anticipated such an order, Mr. Samaras finally telephoned the McLaughlins and stated that Heidi could participate in the Lowell High School graduation. Heidi ultimately did not attend her class’s graduation ceremony because of the emotional strain surrounding this controversy and her discomfort at being on the podium with Messrs. Tsapatsaris and Samaras, whom she believed had done all they could to keep her from attending the ceremony.
Heidi did not graduate in the spring of 1993. In the fall of 1993, the McLaughlins retained counsel, albeit different counsel than their current trial counsel. In February 1994, Heidi began to receive tutoring and was given her first evaluation for special needs. The evaluation team concluded that she did not have a specific learning disability and did not recommend that she receive special education services.
The McLaughlins’ complaint includes four separate claims. Count I alleges intentional infliction of emotional harm against the defendants Tsapatsaris and Samaras only. Count II alleges negligence under the Massachusetts Tort Claims Act against the City alone. Count III alleges an intentional violation of the procedural due process rights guaranteed by the IDEA, in violation of 42 U.S.C. §1983, against all three defendants. Count IV alleges a conspiracy in violation of 42 U.S.C. §1985 against the defendants Tsapatsaris and Samaras.
DISCUSSION
In order to evaluate the motion for summary judgment on any of these claims, we first need to examine the rights and privileges which have been given to children with disabilities to obtain a free appropriate public education, and the remedies available to enforce these rights and privileges.
A. The Individuals With Disabilities Education Act
The Individuals With Disabilities Education Act (“IDEA”), formerly known as the Education of the Handicapped Act (“EHA”), provides federal funding to states and localities to ensure the provision of “a free appropriate public education” to “children with disabilities.” 20 U.S.C. §1400 et seq. “Children with disabilities” includes not only those traditionally recognized as handicapped — the blind, the deaf, the mentally impaired — but also those with “serious emotional disturbance . . . who, by reason thereof, need special education and related services.” 20 U.S.C. §1401(a)(l)[A). “ ‘Special education’ means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability,” and may include home tutoring as well as specialized classroom instruction. 20 U.S.C. §1401(a)(16). “Related services” means those services “as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.” 20 U.S.C. §1401(a)(17).
The IDEA requires state and local educational agencies receiving federal assistance under the Act to “establish and maintain procedures ... to assure that children with disabilities and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies . . .” 20 U.S.C. §1415(a). The Act does not set forth all the procedures that are required under this provision: it simply identifies some that are specifically mandated.[5] Among the procedures specifically identified by statute are:
parental opportunity to obtain an independent educational evaluation of the child: 20 U.S.C. §1415(b)(l)(A);
written prior notice to the parents whenever the school system “proposes to initiate or change, or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child," which notice shall include notice of all the procedures available to them under the Act; 20 U.S.C. §1415(b)(l)(C) and (D); and
“an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.” 20 U.S.C. §1415(b)(l)(E).
Under this section, whenever a complaint is received concerning any of these matters, the parent “shall have an opportunity for an impartial due process hearing” as determined under state law, but the hearing officer for such a hearing may not be employed by the agency involved in the education of the child. 20 U.S.C. §1415(b)(2).
*346 B. Massachusetts Laws and Regulations Complying With the IDEA
While the Act does not speak directly to what steps a local educational agency must take to identify children with disabilities or what constitutes a request for an evaluation triggering the required notice of the procedures available under the Act, both of these holes are filled by the Massachusetts statutes and regulations promulgated to comply with the Act and obtain the consequent federal funding of handicapped education. G.L.c. 71B, §3[6] requires school committees, in accordance with the regulations issued by the State Department of Education, to identify the school age children residing in each school district “who have special needs, diagnose and evaluate the needs of such children, propose a special education program to meet those needs, provide or arrange for the provision of such special education program,” and maintain records of the “identification, diagnosis, proposal and program ...” Eveiy child, however, is presumed to be appropriately assigned to a regular education program and not to be a school age child with special needs or requiring special education “[u]ntil proven otherwise.” G.L.c. 71B, §3. No child may be placed in a special education program without a prior evaluation, and before a child is referred for evaluation, the principal of the child’s school “shall ensure that all efforts have been made to meet such child’s needs within the regular education program.” G.L.c. 71B, §§2, 3. Under the regulations, these required pre-referral efforts must include efforts to modify the regular education program to meet the child’s needs. 603 CMR §28.309.0.
Under the state regulations, if a child is “absent without medical excuse more than 15 school days in any quarter,” the principal of the child’s school must determine whether pre-referral efforts should be made on behalf of the child or whether the child should be referred for evaluation. 603 CMR §28.310.1(d). Regardless of the principal’s decision, the principal must “promptly and in writing notify the parents [of the condition triggering special attention], if a referral is being made, and of their right to make such referral.” 603 CMR §28.310.1.
Separate and apart from this automatic trigger of a referral for evaluation or pre-referral efforts, a parent of the child may refer his or her child to the Administrator of Special Education for an evaluation at any time. 603 CMR §28.311.2. If the School Committee refuses to initiate an evaluation of the child it must, within a reasonable time, give written notice to the child’s parents, with an explanation of the decision and of the procedural safeguards available to the parents to challenge the decision, including their right to due process and mediation, and to bring a civil action. 603 CMR §§28.317.0 — 317.2.
If an evaluation of the child is conducted, it must be done by what is known as a “TEAM,” consisting of a representative of the school committee, a teacher who recently had the child in a classroom, one or both of the child’s parents, the child (if 14 or over, upon request), other individuals requested by the child’s parents, and other specialists as needed. 603 CMR §28.314.0. The TEAM shall review the evaluative data and determine whether the child requires special education. 603 CMR §28.321.2. If so, the TEAM must write an Individualized Education Program (“IEP”) for the child, setting forth the specially designed instruction needed to meet the unique needs of the child with disabilities. 603 CMR §28.321.2; 20 U.S.C. § 1401 (a) (20). If not, the TEAM must give written notice of the reasons to the parents. 603 CMR §28.321.2.
Based on the facts in the record, viewed in the light most favorable to the plaintiffs, the defendants plainly failed to comply with these procedural requirements. Although Heidi had missed fifteen school days in the same school quarter, they failed to notify her parents that, despite this triggering condition, they would not refer her for evaluation and that the parents had the right to challenge this refusal. Similarly, after Mr. McLaughlin had effectively made a parental referral for evaluation on at least two occasions in March 1992 by asking Mr. Samaras for a tutor for his daughter, the School Committee failed to notify the McLaughlins of the reasons for refusing to initiate an evaluation of Heidi and of the McLaughlins’ due process rights to challenge this refusal.
The foreseeable consequences of these procedural violations are plainly factual issues that are materially in dispute. The plaintiffs contend that, if they had received notice of the defendants’ refusal to initiate an evaluation of Heidi and of their procedural rights, they would have appealed the refusal through the Bureau of Special Education Appeals and would have prevailed in forcing the City to evaluate Heidi. Such an evaluation, they contend, would have resulted in a TEAM determination that Heidi had special needs resulting from the emotional trauma of the rape and the formulation of an IEP tailored to her special needs. This would have meant that Heidi would not have gone uneducated for roughly four months during the school year, and that she would have had the required credits to graduate with her class. The plaintiffs seek compensatory damages for the harm done to Heidi educationally and emotionally as a result of the defendants’ failure to comply with their legal obligations under the IDEA and the implementing state regulations, and punitive damages under 42 U.S.C. §1983.
The defendants, on the other hand, contend that the procedural defect had no consequence since, when Heidi was ultimately evaluated, she was found not to have special needs. The plaintiffs, of course, counter that an evaluation completed more than two years after the rape does not reflect Heidi’s emotional condition in the months following the rape.
*347 The plaintiffs further contend that the procedural deficiencies were committed intentionally, indeed maliciously, by the individual defendants. They contend that one of the persons who raped Heidi was a star wrestler at Lowell High School, and that the shoddy manner in which Messrs. Tsapatsaris and Samaras treated Heidi was done to spite her for making the criminal complaint against the wrestler.[7]
Since each count presents a separate cause of action, I will address each separately. However, since the heart of the complaint is Count III, alleging a violation of 42 U.S.C. §1983, I shall begin with that count, since all else to a certain degree follows from that analysis.
C. Count III — Civil Rights Claim Under 42 U.S.C. §1983 Against All Defendants 1. Available Remedies Under §1983 for IDEA Violations
42 U.S.C. §1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
The essence of the plaintiffs’ claim is that Congress gave them certain rights and privileges under the IDEA, specifically procedural due process rights to ensure a free appropriate public education for children with disabilities, and the defendants intentionally deprived them of those rights and privileges, resulting in two types of compensatory damages— emotional distress damages and other money damages resulting from the denial to Heidi of a free appropriate public education. While the source of these rights is the IDEA, the remedy claimed for the deprivation of these rights is §1983, not the IDEA. See, Maine v. Thiboutot, 448 U.S. 1 (1980) (holding that §1983 authorizes suits to redress violations by state officials of rights created by federal statutes as well as the federal Constitution).
The plaintiffs framed the complaint in this fashion for good reason: the relief they seek would not be available under the IDEA, for two separate and distinct reasons. First, the IDEA does not provide a remedy for the failure to comply with procedural notice requirements when that failure results in the child’s family, out of ignorance, not challenging the school’s adverse decision concerning their child. Quackenbush v. Johnson City School Dist., 716 F.2d 141, 147 (2d Cir. 1983); Hymes v. Harnett County Bd. of Educ., 664 F.2d 410, 413 (4th Cir. 1981). Rather, the IDEA simply provides the child’s family with recourse to the federal district court or a state court of competent jurisdiction to appeal the adverse findings and decision of a hearing officer after the child’s family has exhausted their administrative remedies. 20 U.S.C. §1415(e)(2). In such an action, “the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.” Id. When, as the plaintiffs contend happened here, there are no administrative proceedings because the parents, having been denied notice of their procedural rights, did not know that an adverse decision had been made and that they had due process rights to challenge that decision, there is no administrative record to review and no findings and decision to appeal.
Second, even if this court could review the defendants’ alleged decision in the spring of 1992 to not initiate a special needs evaluation of Heidi McLaughlin and found that decision wrong, it could not under the IDEA grant the relief sought by the plaintiffs. In School Committee of the Town of Burlington, Massachusetts v. Department of Education of the Commonwealth of Massachusetts, the United States Supreme Court sharply limited the scope of money damages under the IDEA. 471 U.S. 359 (1985). In short, as interpreted consistently by subsequent court decisions, the relief in monetary damages a court may determine to be appropriate under the IDEA is limited to reimbursement to the parents for their expenditures on private special education when the court determines that this private placement, rather than the placement proposed under the IEP, was appropriate for the child under the IDEA. Id.; See, e.g., Ft. Zumwalt School Dist. v. Clynes, 119 F.3d 607, 614-15 (8th Cir. 1997); Doe v. Vernon Parish School Bd., 928 F.Supp. 663, 664 (W.D. LA. 1996); Union School Dist. v. Smith, 15 F.3d 1519, 1527 (9th Cir. 1994), cert. denied, 523 U.S. 965 (1995); Hall v. Knott County Bd. of Educ., 941 F.2d 402, 407 (6th Cir. 1991), cert. denied, 502 U.S. 1077 (1992); Muth v. Central Bucks School Dist., 839 F.2d 113, 126-27 (3rd Cir. 1988); Jenkins v. Florida, 815 F.2d 629, 631 (11th Cir. 1987). A court under the IDEA may not award damages for emotional distress or the consequences of a denial of a free appropriate public education. Ft. Zumwalt, supra at 615; Brantley v. Independent School Dist. No. 625, St. Paul Public Schools, 936 F.Supp. 649, 656 (D.Minn. 1996); Waterman v. Marquette-Alger Intermediate School Dist., 739 F.Supp. 361, 364 (W.D. Mich. 1990); Smith v. Philadelphia School Dist., 679 F.Supp. 479, 484 (E.D. Pa. 1988). Nor may punitive damages be awarded under the IDEA. Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir. 1996); Brantley, supra at 654. If the damages that may be awarded under §1983 for violations of the IDEA were limited to those available under the IDEA, then summary judgment would be appropriate on Count III because there would be no possibility of an award of damages *348 even if liability were found. Ankiewicz v. Kinder, 408 Mass. 792, 795 (1990).
In Smith v. Robinson, 468 U.S. 994 (1984), the Supreme Court, citing its earlier decision in Middlesex County Sewerage Authority v. National Sea Clammers Assn., 453 U.S. 1 (1981), found that, “when a statute creates a comprehensive remedial scheme," intentional omissions from that scheme, whether they concern the existence of a private right of action or the scope of the remedies provided under a private right of action, “should not be supplemented by the remedial apparatus of §1983.” Smith v. Robinson, supra at 1003. The Supreme Court in Smith found that the EHA, the predecessor to the IDEA, indeed was intended by Congress to be the exclusive avenue through which a plaintiff may make claims under the EHA or related constitutional claims, such as the denial of due process or of an equal protection right to a free appropriate public education. Id. at 1008. Consequently, if a remedy, such as an award of attorneys fees, was not provided for under the EHA, it could not be obtained simply by adding a claim under §1983. Id. at 1008-13.
In Smith, the Supreme Court stated;
We do not lightly conclude that Congress intended to preclude reliance on §1983 as a remedy for a substantial equal protection claim. Since 1871, when it was passed by Congress, §1983 has stood as an independent safeguard against deprivations of federal constitutional and statutoiy rights. Nevertheless, §1983 is a statutoiy remedy and Congress retains the authority to repeal it or replace it with an alternative remedy. The crucial consideration is what Congress intended.
Id. at 1012 (citations omitted, emphasis added).
In 1986, Congress declared decisively that the Supreme Court misread what Congress intended when it passed the EHA. In the Handicapped Children’s Protection Act of 1986, Congress not only added provisions to the EHA that provided for an award of attorney’s fees to the prevailing party but, more importantly, it added subsection (f) to 20 U.S.C. §1415, which states:
Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, Title V. of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.
20 U.S.C. §1415(f).
The plain language of this amendment makes it clear that Congress intended to preserve Section 1983 as a separate remedy for violations of the rights of children with disabilities. If there were any doubt, the House Report eliminates it:
In sum, since 1978, it has been Congress’ intent to permit parents or guardians to pursue the rights of handicapped children through EHA, Section 504 [of the Rehabilitation Act of 1973] and Section 1983 . . . Congressional intent was ignored by the U.S. Supreme Court when, on July 5, 1984, it handed down its decision in Smith v. Robinson . . . Section 3 of the bill re-establishes the relationship between EHA and Section 504 and other statutes redressing the rights of handicapped children that existed prior to the Supreme Court’s decision in Smith v. Robinson, thereby reaffirming the viability of Section 504 and other federal statutes such as 42 U.S.C. 1983 as separate from but equally viable with EHA as vehicles for securing the rights of handicapped children and youth.
H.R.Rep. No. 296, 99th Cong., 1st Sess. 4, 6 (1985).
Despite the passage of the Handicapped Children’s Protection Act of 1986 and the clear intent of Congress to restore remedies available under §1983 to safeguard the rights of handicapped children, there remains a remarkable split among the federal circuits as to whether money damages beyond the reimbursement of parents for their expenditures on private special education are available under §1983 for wrongs cognizable under the IDEA.[8] Compare cases holding reimbursement as exclusive monetary damages remedy under 42 U.S.C. §1983 for violations of IDEA: Ft. Zumwalt School Dist. v. Clynes, supra at 615 (8th Cir. 1997) (court affirmed dismissal of claims for damages under IDEA and §1983 for physical illness and emotional distress caused by school district’s failure to provide adequate education); Crocker v. Tennessee Secondary School Athletic Assoc., 980 F.2d 382, 386-87 (6th Cir. 1992), quoting Burlington Sch. Comm. v. Massachusetts Dept. of Educ., supra at 370-71 (learning disabled student sought general damages for emotional anguish under §1983 for violations of IDEA, and court held, “ ‘we do not find case authority interpreting the Act [EHA] to allow award of general damages for emotional injury or injury to a dignitary interest’ . . . Because [plaintiff] cannot recover general damages under the EHA, he cannot recover damages under §1983 for any violation of his rights secured by EHA”); Valerie J. v. Derry Co-op. School Dist., 771 F.Supp. 483, 492 (D.N.H. 1991) (where plaintiff student and parents sought monetary damages under §1983 for violation of IDEA, claiming student was not obtaining free appropriate public education, court held that it must look to the EHA to establish available remedies and, under the EHA, a monetary damage remedy was not authorized and was not consistent with the goals of the Act), with cases *349 awarding monetary damages under 42 U.S.C. §1983 for IDEA violations: Walker v. District of Columbia, 969 F.Supp. 794, 796-97 (D.D.C. 1997) (student who alleged deprivation of services related to his special education needs could bring action for monetary damages under §1983 to vindicate rights under IDEA); Charlie F. v. Bd. of Educ. of Skokie School Dist., 98 F.3d 989, 991-93 (7th Cir. 1996) (court assumes, without expressly deciding, that compensatory money damages are available to disabled student who brought action pursuant to §1983 for violations of IDEA); W.B. v. Matula, 67 F.3d 484, 495 (3rd Cir. 1995) (in a §1983 action to enforce IDEA, the court held “certainly the plain language of §1983 authorizes actions at law or equity, and . . . compels the conclusion that, as a matter of law, an aggrieved parent or child is not barred from seeking monetary damages in such an action”); Jackson v. Franklin County School Bd., 806 F. 2d 623, 631-32 (5th Cir. 1986) (where plaintiff brought suit under EHA and §1983 claiming he had been unlawfully excluded from public schools, court remands case to district court to determine appropriate damages with instructions that “the district court must determine what damages, either monetary, or in the form of remedial educational services for [plaintiff], would be appropriate . . . [I]f the district court finds . . . that [plaintiff] was injured by the defendants’ actions or omissions, damages should be assessed. We add finally that if such is the case, although monetary relief is available, remedial educational services may be more valuable than any pecuniary damages that could be awarded”).
Those courts that insist that emotional distress damages are not available for IDEA claims brought under §1983 appear to base their decision on three pragmatic policy judgments. First, these courts are unwilling to find that a plaintiff alleging a violation of the IDEA is limited, at most, to reimbursement of the expenses of private special education on his claim under the IDEA, but this damage limitation can be evaded and emotional distress damages awarded simply by alleging the same facts in a §1983 claim. Crocker, supra; Valerie J. supra.
Second, these courts recognize the enormous potential for significant damage claims that would arise if emotional distress damages were available for violations of the IDEA. They find that the purpose of the IDEA is to focus scarce educational resources on ensuring handicapped children a free appropriate public education, and that this purpose would be defeated if these scarce resources were diverted to paying sizeable emotional distress damage awards and the attorney’s fees needed to defeat such expensive claims. See, e.g., Ft. Zumwalt, supra ; Valerie J., supra. See also, Kelly K. v. Framingham, supra note 8.
Third, they recognize that such damage claims would blow a huge hole in the exhaustion requirement of the IDEA, a requirement that was reaffirmed in the 1986 revisions to the Act. The reason is that the exhaustion requirement is typically waived when it would be plainly futile to pursue a claim administratively. Honig v. Doe, 484 U.S. 305, 327 (1988); Crocker, supra. Such futility would always be present when the plaintiff seeks money damages for emotional distress, because no hearing officer would be authorized to award such damages, regardless of his or her findings. Ft. Zumwalt School Dist. v. Clynes, supra at 614-15; Union School Dist. v. Smith, supra at 1527; Hall v. Knott County Bd. of Educ., supra at 126-27. See also, 603 CMR §§28.404.2 and 404.3 (authorizing hearing officers to order school committee only to reimburse the parents for private special education expenses incurred after the parents gave notice to the school committee that the IEP was inappropriate).
A court properly may share these policy judgments and question whether Congress would enact legislation contrary to them. Yet, a court is still bound to respect the plain language of a federal statute, and 20 U.S.C. §1415(f) plainly declares that the IDEA does not limit the remedies available under other federal statutes, including Section 1983. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992) (“In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute’s meaning, in all but the most extraordinary circumstance, is finished”); Arnold v. United Parcel Service, Inc., 1998 WL 63505 (1st Cir. 1998), quoting Caminetti v. United States, 242 U.S. 470, 485 (1917) (“If the language of a statute ‘is plain and admits of no more than one meaning’ and ‘if the law is within the constitutional authority of the law-making body which passed it’ then ‘the duty of interpretation does not arise’ and ‘the sole function of the court is to enforce the statute according to its terms’ ”). Nor is this a case where the legislative history differs from the plain language; the Supreme Court in Smith read the EHA to exclude a separate remedy under §1983 and the House Report makes it clear that Congress never intended this result and wished to return the law to where it was before Smith. See, H.R.Rep. No. 296, 99th Cong., 1st Sess. 4, 6. One may wonder why Congress did this and whether it recognized its potential fiscal consequences.[9] But one cannot doubt that this is indeed what Congress has done.
Once it is plain that Congress did not intend the IDEA to limit the scope of the remedies available under §1983, one must look to Supreme Court caselaw to determine what the scope is of remedies under that provision. “The general rule ... is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.” Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 70-71 (1992). The Supreme Court case of Carey v. Piphus plainly states that *350 mental and emotional distress caused by the denial of procedural due process is compensable under Section 1983 provided the plaintiff can prove actual injury resulting from such a denial. 435 U.S. 247, 264 (1978). Even if no actual damages can be established, the jury may give nominal compensatory damages and impose punitive damages against the individual (although not the municipal) defendant to deter or punish the malicious deprivations of rights. Id. at 266; Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981).
The underlying facts of Carey are analogous to the instant case even though they were not premised on procedural violations of the IDEA. In Carey, two students were suspended from high school without due process, one for smoking marijuana and the other for wearing an earring. They sued under Section 1983, claiming violations to their Fourteenth Amendment due process rights. The Supreme Court permitted two types of actual damages to be awarded for due process violations, provided they were proven. First, the plaintiffs were entitled to recover damages for the injuries caused by the suspensions, including the value of missed school time, but only if they established that they would not have been suspended if a proper hearing had been held. Carey, supra at 260. Second, even if they would have been suspended anyway, they would be entitled to damages for any mental suffering or emotional anguish caused by the denial of procedural due process, if they can establish genuine injury that was reflected in their conduct and observed by others. Id. at 262-64 and n. 20.
The alleged procedural violations at issue in the instant case are no less serious than that alleged in Carey, indeed, the suspensions in Carey were only for twenty days, which is far less time lost from school than that lost by Heidi McLaughlin as a result of the defendants’ alleged conduct. Since the Supreme Court found these two types of damages cognizable for the procedural violations in Carey, there is no reason, given Congressional intent not to limit the remedial scope of §1983 under the IDEA, that these types of damages should not be equally available, if proven, to Heidi McLaughlin.
There is another separate and distinct reason why these two types of damages are appropriate for claims of procedural denials of due process under the IDEA; if the only remedies for these violations were those provided under the IDEA, there would be no remedy available for such procedural violations. Quackenbush, 716 F.2d at 147; Hymes, 664 F.2d at 413. As noted earlier, a civil action under the IDEA is contemplated essentially as an appeal of an adminstrative denial of a free appropriate public education. But where, as here, the violation is the failure to inform the parents of a decision denying the initiation of an evaluation of their child and of their rights to challenge this decision, the parents will not know enough to pursue their adminstrative remedies and to bring the matter before a court. As allegedly happened here, by the time they become aware of their procedural rights, their child will already have suffered a denial of her right to a free appropriate public education. Since the damages from these procedural violations will be in the past, no injunctive relief will be available and, unless the parents removed their child from the public school and paid for private special education, the only remedy available will be money damages for mental and emotional distress and the past denial of an appropriate IEP. If no money damages were available, no remedy for procedural due process violations of the IDEA would exist. It is this “lacuna” in the IDEA — the apparent grant of a statutory right without a statutory remedy — that Congress intended to be filled by the remedy of money damages under §1983. See, Quackenbush, supra at 148; Hymes, supra at 412-13.
2. Exhaustion of Administrative Remedies
The defendants further contend that summary judgment is warranted on the §1983 claim because the plaintiffs failed to exhaust administrative remedies; indeed, in this case, the plaintiffs availed themselves of no administrative remedy. The plaintiffs reply that exhaustion of administrative remedies, while generally applicable to §1983 claims founded on IDEA violations (see, 20 U.S.C. §1415(0), is not required here. I agree with the plaintiffs that exhaustion of administrative remedies is not required under the circumstances alleged in this case.
There are two exceptions to the exhaustion requirement that, viewing the facts in the light most favorable to the plaintiffs, apply to this case. First, as the Supreme Court declared in Honig v. Doe, “parents may bypass the administrative process [under the IDEA] where exhaustion would be futile or inadequate.” 484 U.S. at 327. See also, Christopher W. v. Portsmouth School Committee, 877 F.2d 1089, 1094-97 (1st Cir. 1989). Here, as noted earlier, exhaustion of administrative remedies would be both futile and inadequate, since the only relief sought — monetary damages— would not be available administratively. See, infra at p. 22.
Second, exhaustion of administrative remedies is not required where “the school has denied the plaintiff access to the administrative remedies.” Christopher W., 877 F.2d at 1096 (emphasis in original). Here, the defendants’ failure to inform the McLaughlins that a decision had been made not to initiate an evaluation of Heidi and that they had procedural rights to challenge that denial administratively effectively denied them access to these administrative remedies. This does not appear to be a case where the failure to inform the plaintiffs of their due process rights meant the absence of a mere formality, without substantive consequence. Compare with Christopher W., supra at 1097 (failure to inform of due process rights deemed insignificant since plaintiff had already retained coun *351 sel). There is no evidence that the McLaughlins had retained counsel prior to autumn 1993 or that they were knowledgeable of their due process rights under the IDEA despite the lack of notice.
3. Qualified Immunity
The individual defendants maintain that summary judgment is required on the Section 1983 claim because of their qualified or good faith immunity as government officials. The Supreme Court has held that “government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In reviewing Section 1983 claims against government officials on summary judgment, trial courts are urged to determine whether the law allegedly violated “was clearly established at the time an action occurred.” Id. If so, “the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.” Id. at 818-19. Here, there is substantial evidence that the IDEA’S due process requirements, as articulated in Massachusetts by the regulations of the Commonwealth’s Department of Education, were violated when the school system failed to notify the McLaughlins of their right to make a referral, of the decision not to initiate an evaluation of Heidi, and of their due process rights to challenge this latter decision. See, infra at pp. 9-12. These legal requirements were clearly established in 1992 by state regulation when the defendants first addressed the McLaughlins’ request for tutoring for Heidi and remained in force during all relevant events in this lawsuit. See, 603 CMR §§28.310.1, 28.311.2, 28.317.0, 28.317.1, and 28.317.2. A jury reasonably may find, viewing the evidence in the light most favorable to the plaintiffs, that a reasonably competent school superintendent and high school principal should be familiar with these and other specifically stated written requirements of federal and state law governing the provision of a free appropriate public education to children with disabilities.
4. Custom and Policy
The defendant City contends that it is entitled to summary judgment on the Section 1983 claim because the plaintiffs have failed to present adequate evidence that the alleged constitutional and statutory violations represent the official policy of the City. In the seminal case of Monell v. New York City Department of Social Services, the Supreme Court held:
We conclude, therefore, that a local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983.
436 U.S. 658, 694 (1978). “[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.” Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986). Those circumstances, which have been carefully circumscribed by the Supreme Court, are present where- — and only where — the decision was a deliberate choice made from among various alternatives by the municipal officer who “possesses final authority to establish municipal policy with respect to the action ordered.” Id. at 481, 483. The determination of whether an official has final policymaking authority is a question of state law. St. Louis v. Praprotnick, 485 U.S. 112, 124 (1988). Final authority may be granted directly via legislative enactment or it may be delegated by another official who otherwise would possess such authority. Pembaur, supra at 483. However, a court may not conclude that a municipal official possesses final policymaking authority in a subject area simply because that official’s decision is effectively final in view of the municipality’s actual power structure. St. Louis, supra at 124, n. 1. A court “would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.” Id. at 126. Moreover, the official found to be the final decisionmaker must truly have the final word with respect to a decision in that subject area; his decision may not be constrained by policies made by another or be subject to review by another policymaker. Id. at 127. When it is, it is the constraining or reviewing official, not the person making the decision that can be constrained or reviewed, who is the true final policymaking official. Id.
Massachusetts law, by statute, declares that the school committee “shall establish educational goals and policies for the schools in the district consistent with the requirements of law and statewide goals and standards established by the board of education." G.L.c. 71, §37. The superintendent of schools “shall manage the system in a fashion consistent with state law and the policy determinations of that school committee.” G.L.c. 71, §59. School principals “shall be the educational administrators and managers of their schools and shall supervise the operation and management of their schools . . . , subject to the supervision and direction of the superintendent." G.L.c. 71, §59B. In short, the school committee makes policy; the school superintendent and principals implement those policies.
Similarly, state statutory law governing the education of children with special needs also places with the school committee the ultimate responsibility to identify school age children with special needs, diagnose and evaluate their needs, propose a special education program to meet those needs, and provide or arrange to provide such a program. G.L.c. 71B, §3. It further *352 places in the school committee the ultimate responsibility to ensure that parents receive adequate notice of decisions regarding referrals of their children for evaluation. G.L.c. 71B, §3. See also, 603 CMR §§28.310.0, 28.317.1. While Messrs. Tsapatsaris and Samaras certainly were delegated substantial authority by the School Committee to decide matters regarding children with special needs (or who may have special needs), there can be little doubt that the School Committee constrained their decisions by establishing relevant policies and retained the ultimate authority to ratify or reverse them. Indeed, in this case, the issue of whether Heidi could participate in the Lowell High School graduation was appealed to the School Committee.
Consequently, I find that the final policymaking official with respect to the identification and evaluation of children with special needs, the preparation of an IEP for them, the provision of a free appropriate public education in accordance with the IEP, and the furnishing of adequate notice to parents of all such decisions and of the parents’ due process rights to challenge these decisions is the Lowell School Committee, not the individual defendants. Consequently, since the alleged misconduct of Messrs. Tsapatsaris and Samaras regarding the McLaughlins cannot be said to represent the official policy of the City, the City cannot be held legally responsible for their conduct.
Nor does the record demonstrate a “widespread practice that, although not authorized by written law or express municipal policy, is ‘so permanent and well settled as to constitute a custom or usage with the force of law.’ ” St. Louis, supra at 127, quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970). The plaintiffs have provided only one other allegation supported by affidavit of a violation of the procedures required by the IDEA — the affidavit of Mary Vergados that her daughter was absent without medical excuse for more than fifteen days in two school quarters in the 1993-94 school year, but received no notice from the school regarding any special education issues or any referral for evaluation. Two such instances fall short of the pattern needed to demonstrate a widespread practice constituting a custom or usage with the force of law. Armstrong v. Lamy, 938 F.Supp. 1018, 1035 (D.Mass. 1996).
As a result, summary judgment is granted to the City on the §1983 claim but denied to the individual defendants.
E. Count II — Negligence Claim Against the City of Lowell under the Massachusetts Tort Claims Act
The defendant City argues that it is entitled to summary judgment on the plaintiffs’ negligence claim under the Massachusetts Tort Claims Act (“the Act”), G.L.c. 258, §1 et seq., because the conduct alleged in that claim falls within the discretionary function exemption of the Act. The plaintiffs respond that the complained-of negligence is based solely on conduct that the defendants were obliged to perform under federal and state statutes and regulations, and therefore falls outside the scope of the discretionary function exemption.
Sadly, summary judgment here must be determined more by the manner in which the plaintiffs framed this count in the complaint than by the substance of the underlying alleged misconduct. See, Brum v. Town of Dartmouth, 1998 WL 75536 (Mass.App.Ct. 1998) (Superior Court judge erred in dismissing the negligence count by reading the complaint as attacking the nature and extent of school building security rather than school’s failure to adopt safety policies required by statute). If this count in the complaint were framed to allege negligence in the evaluation, placement, or delivery of educational services to Heidi McLaughlin, the City would be exempt from liability because such a claim would be “based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee . . .” G.L.c. 258, § 10(b). See, Bencic v. Malden, 32 Mass.App.Ct. 186 (1992). See also, Doe v. Town of Framingham, 965 F. Supp. 226, 229-30 (D.Mass. 1997) (there is no common law tort of educational malpractice under Massachusetts law), and cases cited. The plaintiffs, however, carefully framed this count to avoid this attack; it is narrowly crafted only to allege negligence arising from the defendants’ failure to fulfil their duty to implement the procedures required by law to identify Heidi as a special needs student. Where a public employee “had no discretion because a course of conduct was prescribed by a statute, regulation, or established agency practice, a discretionary function exception to governmental liability has no role to play in deciding the case.” Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141 (1992); Brum v. Town of Dartmouth, supra at *3, quoting Stoller, Id.
To the extent that the negligence count is limited to the negligent violation of specific legal obligations set forth in the IDEA and its implementing regulations, it survives summary judgment. Specifically, the City may be found negligent for Mr. Samaras’s alleged failure to determine whether pre-referral efforts or a referral for evaluation should have been made once Heidi was absent without medical excuse for more than fifteen school days in one quarter, and for his alleged failure to notify the McLaughlins as to whether a referral had been made and their right to make such a referral, as required under 603 CMR §28.310.1. Similarly, viewing the evidence in the light most favorable to the plaintiffs, the City may be found negligent for the defendants’ alleged failure to notify the McLaughlins of the decision not to initiate an evaluation of Heidi after the referral for evaluation by Mr. McLaughlin and of their due process rights to challenge *353 that decision, as required under 603 CMR §§28.311.2 and 28.317.1.[10]
F. Count IV — Conspiracy Claim under 42 U.S.C. §1985(3) Against the Individual Defendants
The individual defendants have moved for summary judgment on Count IV, which alleges that the defendants Tsapatsaris and Samaras conspired together for the purpose of depriving the plaintiffs of the equal protection of the laws of the United States, including their right to a free appropriate public education and the procedures guaranteed under the IDEA. However, to support a conspiracy claim under §1985(3), the plaintiffs must establish “some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators’ action.” Griffin v. Breckenridge, 403 U.S. 88, 101 (1971). Moreover, to survive summary judgment, the plaintiffs must do more than simply allege a conspiracy affecting the interests of a particular class; they must show that the individual defendants “conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious.” Harrison v. Brooks, 519 F.2d 1358, 1359-60 (1st Cir. 1975). The plaintiffs have failed to make the factual showing required to survive summary judgment.
While the complaint alleges that the deprivation of rights was based on Heidi’s gender, the evidence presented in support of this proposition does not demonstrate a reasonable likelihood of prevailing on this claim; indeed, the evidence barely exists. All that the plaintiffs muster in support of their claim of gender animus, apart from the alleged shoddy treatment of Heidi after her rape, is:
an article in the Lowell Sun dated December 9, 1993 declaring that a member of the Lowell School Committee, not Messrs. Tsapatsaris or Samaras, saw no need for a sexual harassment policy in the school system because sexual harassment historically “was good for us”;
the failure of the high school to respond successfully to a high school student’s claim that she was being sexually harassed by a male student;
Mr. Samaras’s alleged statement to Heidi’s sisters that “you may think what happened to your sister was bad, but worse things have happened to others”; and
Mr. Samaras’s alleged instructions to Patricia Kealy, the Housemaster at Lowell High School, that Heidi should be given a demerit for skipping school on the day she was raped, when a student who allegedly participated in her rape and who also skipped school that day did not have a demerit.
None of this evidence supports the contention that the reason why the defendants allegedly mistreated Heidi and her parents was because of Heidi’s gender. Indeed, while the plaintiffs declare the individual defendants’ supposed animus against women, the contention they declare more passionately is that the individual defendants denied Heidi her right to a free appropriate public education and her procedural rights under the IDEA in order to punish her for making a criminal complaint against a star wrestler at Lowell High. This spitefulness, if true, is despicable, but it does not make out a conspiracy claim under §1985. Summary judgment shall be granted on Count III.
G. Count I — Intentional Infliction of Emotional Distress Against the Individual Defendants
The individual defendants have moved for summary judgment on Count I, which alleges that Messrs. Tsapatsaris and Samaras intentionally inflicted severe emotional distress on the McLaughlins through extreme and outrageous behavior in retaliation for Heidi having accused a star high school wrestler of rape.
The plaintiffs’ burden at trial to establish intentional infliction of emotional harm is formidable. As the Supreme Judicial Court recently declared:
To prevail on their claim for intentional infliction of emotional distress, the plaintiffs must establish “(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant’s conduct was extreme and outrageoüs, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiffs distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.” Payton v. Abbott Labs, 386 Mass. 540, 555, 437 N.E.2d 171 (1982), citing Agis v. Howard Johnson Co., 371 Mass. 140, 145, 355 N.E.2d 315 (1976). Liability cannot be predicated on “ ‘mere insults, indignities, threats, annoyances, petty oppressions or other trivialities’ nor even is it enough ‘that the defendant has acted with an intent which is tortious or even criminal, or that he has intended'to inflict emotional distress, or even that his conduct has been characterized by ’’malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.’ “ Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72 (1987), quoting Restatement (Second) of Torts §46, comment d (1965).
Tetrault v. Mahoney, Hawkes & Golding, 425 Mass. 456, 466 (1997).
In view of this high standard, the only allegations in the complaint regarding this count that could possibly withstand summary judgment are that the individual defendants purposely treated Heidi McLaughlin and her family with heartless disdain in order to punish her for reporting her rape and identifying her rapists, one of whom was a star wrestler at Lowell High School. The evidence in support of this sinister motive *354 is thin; proof of such a motive, if it is to come from anywhere, must be inferred from the defendants’ alleged mistreatment of Heidi McLaughlin coupled with the far better treatment accorded the alleged rapist. The strongest evidence of such intent, if believed, is Mr. Samaras’ alleged insistence on giving Heidi a demerit for missing school on the day she was raped, while permitting one of the rapists, who also missed school that day, to avoid a similar demerit. Given the paucity of this evidence, summary judgment would be warranted if it were not for two considerations.
First, the core question regarding this claim is the individual defendants’ state of mind when they allegedly mistreated the plaintiffs, and summary judgment is disfavored on issues of state of mind, motive, and intent. See, e.g., Tetrault v. Mahoney, Hawkes & Golding, supra at 467 (“summary judgment on a matter dealing with intent requires great circumspection”); Labonte v. Hutchins & Wheeler, 424 Mass. 813, 820 (1997). Second, the evidence that would be admissible on this claim is likely to be admitted at trial anyway since the §1983 claim against the individual defendants has survived summary judgment and punitive damages may be sought under that claim. Therefore, since the critical factual issue concerns the individual defendants’ state of mind, there is some, albeitmeager, factual support for the proposition that the defendants intentionally mistreated Heidi to punish her for accusing those who raped her, and little, if any, evidence not otherwise admissible on another count would be needed to try this claim, the most prudent course of action is to deny summary judgment and allow this claim to be resolved at trial.
ORDER
For the reasons stated above, it is hereby ORDERED that:
1. The defendants’ motion for summary judgment is GRANTED on Count IV (42 U.S.C. §1985 conspiracy) and, as to the defendant City of Lowell only, on Count III (42 U.S.C. §1983 violations).
2. The defendants’ motion for summary judgment is DENIED on Counts I (intentional infliction of emotional harm), Count II (negligence), and, as to the individual defendants only, Count III (42 U.S.C. §1983 violations).

Since Heidi was in high school when the allegations in the complaint occurred and her mother is also a plaintiff, I will refer to her by her first name to avoid confusion with her mother. No disrespect is intended by this convenience.

The record is not clear whether she began to attend Lowell Catholic in May 1992 or with the beginning of the school year in September, but it appears that she began attending classes at Lowell Catholic in May.

Section 1415(b)(1) states, “The procedures required by this section shall include, but shall not be limited to ... [a number of specifically articulated procedures].”

Although this legislation is found in Chapter 7 IB of the Massachusetts General Laws, it was Chapter 766 of the statutes enacted in 1972, and is therefore often referred to as Chapter 766.

The plaintiffs also argue that the shoddy treatment constituted gender discrimination, thereby denying Heidi, as a woman, the equal protection of the laws. As discussed at pp. 35-37, to the extent that this claim is made, the record does not reflect sufficient evidence of gender discrimination to survive summary judgment.

The First Circuit is among the few that has been silent on this subject. The Massachusetts Appeals Court in Kelly K. v. Framingham declared that damages for pain and suffering could not be awarded for violations of the IDEA, regardless of the legal theory pursued. 36 Mass.App. 483, 488 (1994). The Appeals Court reasoned:
Were courts to entertain claims such as the plaintiffs’, the limited financial resources available to benefit children with special educational needs could be diverted from the programs and services designed for their benefit and could harm the class of persons the legislation was intended to protect.
Id. at 489. This decision, however, cannot be seen as controlling, because the Appeals Court also declared that the IDEA provided “the exclusive avenue” for pursuing a claim under the IDEA, citing in support of this proposition Smith and other cases that predated the 1986 change to the IDEA. Id. Since the Court did not even make reference to the change in the IDEA, it is likely that the Court was not aware that Smith had effectively been reversed by subsequent legislation.

Congress recognized that the 1986 amendment could affect the budgets of state and local governments, but the analysis of the Congressional Budget Office focused only on the availability of attorney’s fees, not the availability of a broader damage remedy under §1983. See, S.Rep. No. 99-112, 99th Cong., 2nd Sess. (1986).

There remains a question as to whether a negligence claim framed this narrowly constitutes an actionable negligence claim under the common law. In the wake of the Stoller and, especially, the Brum decisions, the question should be posed whether any violation of a statute or regulation may support a claim of negligence as long as the violation describes a legal duty owed to students. If so, this effectively would provide a remedy in tort for such violations even when no private cause of action is included in the legislative enactment and the common law recognizes no such tort in any other context. As a matter of prudence, this question is not ripe for decision at summary judgment. It was not briefed by the parties and, even if it were, it raises unique issues whose resolution on appeal would be difficult to predict. Consequently, the better course is to allow this claim to be tried and a verdict returned, and then, if necessary, resolve this legal question. This way, if the claim is dismissed and the Appeal Court finds that to be error, the case need not be retried. I note that permitting this count to be tried adds little to the length of the trial or the burden of the parties, since the evidence on this count will basically mirror that offered on the §1983 count, and the attorney for the City is also the attorney for the individual defendants. Cf. Soares v. Lakeville Baseball Camp, Inc., 369 Mass. 974, 975 (1976).